**SECOND DIVISION**
**BARNES, P. J.,**
**MILLER and RAY, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**March 27, 2014**

# In the Court of Appeals of Georgia

A13A1833. PRUETTE v. UNGARINO.

A14A0044. PHOEBE PUTNEY MEMORIAL HOSPITAL, INC. v.
     PRUETTE.

A14A0045. PRUETTE v. PHOEBE PUTNEY MEMORIAL
     HOSPITAL, INC. et al.

RAY, Judge.

These appeals arise from a wrongful death action alleging medical negligence

brought by the plaintiff for the death of her mother, who died allegedly as the result

of receiving an overdose of morphine ordered by Dr. Thomas Ungarino and

administered by a nurse employed by Phoebe Putney Memorial Hospital ("Phoebe

Putney") (collectively, "defendants"). The case proceeded to a jury trial, and the jury

returned a verdict for the plaintiff and against the defendants, jointly and severally.

Dr. Ungarino and Phoebe Putney filed separate motions for new trial, which the trial

court granted on the grounds that it had erred as a matter of law in allowing plaintiff's expert pulmonologist to offer opinions "in which the issue of informed consent was injected into the standard of care evidence." The case was retried, and at the second trial, the jury absolved Dr. Ungarino but found against Phoebe Putney. Phoebe Putney filed a motion for new trial from the second trial, which was denied.

For the purposes of appeal, we consolidate Case Nos. A13A1833, A14A0044, and A14A0045.

In Case No. A13A1833, plaintiff appeals from the trial court's grant, in a single order, of both defendants' motions for new trial after the first trial on the grounds that the defendants' expert pulmonologist inserted inadmissible testimony into trial regarding Dr. Ungarino's duty to obtain informed consent. In doing so, plaintiff argues that any objection regarding the impermissible injection of testimony as to informed consent was waived by defendants' failure to raise and object to such at trial, or in the alternative, that the trial court erred because no testimony regarding informed consent was presented to the trier of fact in this case. In Case No. A14A0044, Phoebe Putney appealed from the denial of its motion for new trial after the second trial, alleging that the trial court committed several errors during the trial. In Case No. A14A0045, plaintiff filed a cross-appeal, arguing (again) that the trial

court's grant of Phoebe Putney's motion for new trial after the first trial was in error. Because we find that the trial court correctly granted the motion for new trial after the first trial as to plaintiff's case against Dr. Ungarino, but incorrectly granted it as to Phoebe Putney, we affirm the judgment in part and reverse the judgment in part as to A13A1833, reverse the judgment in A14A0045, and dismiss Phoebe Putney's enumerations of error set forth in A14A0044 as moot.

The grant of a motion for new trial on special grounds involving a question of law is reviewed by this Court de novo, and this Court will "reverse if the trial court committed legal error." (Citations and footnotes omitted.) *Govt. Employees Ins. Co. v. Progressive Casualty Ins.Co.*, 275 Ga. App. 872, 873-874 (1) (622 SE2d 92) (2005).

The record shows that the decedent, Janie Vinson, was 79 years old at the time of her death. In the final years of her life, she suffered from end-stage chronic obstructive pulmonary disease ("COPD"), a lung disorder that resulted in airway obstruction and difficulty breathing. On March 7, 2002, Vinson experienced progressively worsening shortness of breath, was brought to Phoebe Putney, and was admitted for treatment.

3

During her hospitalization, Vinson was treated by her pulmonologist, Dr. Mehta, and her primary care doctors at Albany Internal Medicine Group. After several days in the hospital, her condition began to improve. On the morning of March 18, 2002, however, Vinson's condition significantly worsened, and she went into respiratory distress.

An emergency code was called, and several doctors, including defendant Dr. Ungarino, responded. Dr. Ungarino, a pulmonary critical care physician, had never seen Vinson before as a patient and had never been consulted about her treatment or care during her hospitalization. Vinson's attending physician, Dr. Kay Kitchen, also responded to the code and came into the room after Dr. Ungarino. Dr. Ungarino had been preparing to intubate Vinson, but stopped when Dr. Kitchen informed him of Vinson's prior request not to be intubated.

Dr. Kitchen then took over Vinson's care and, after consulting with Vinson's family and Dr. Mehta, her pulmonologist, ordered 2 milligrams of morphine to be administered to Vinson on an as-needed basis. Dr. Ungarino then reviewed Vinson's chart and, without speaking to Dr. Kitchen, Dr. Mehta, the nurse, or Vinson's family, changed Vinson's chart to order that she be given 20 milligrams of morphine in a single dose. Approximately 40 minutes after the code ended, nurse Linda Hurdle

4

came into the room and administered 20 milligrams to Vinson, per Dr. Ungarino's order. Vinson soon lost consciousness and died approximately three hours later.

Plaintiff filed suit against Dr. Ungarino and Phoebe Putney for the wrongful death of her mother. She alleged that Dr. Ungarino violated the standard of care by ordering the rapid infusion of 20 milligrams of morphine into an end-stage COPD patient and that administration of such a high dosage caused Vinson's death.

Plaintiff further alleged that Vinson's nurse, Linda Hurdle, violated the nursing standard of care by administering the dose of morphine and that Phoebe Putney could be held vicariously liable for her actions.

The case proceeded to a jury trial, and the jury returned a verdict for the plaintiff and against the defendants, jointly and severally. In a single order, the trial court granted the defendants' separate motions for new trial on the grounds that it had erred as a matter of law in allowing plaintiff's expert to offer opinions "in which the issue of informed consent was injected into the standard of care evidence," and that plaintiff improperly presented arguments involving the doctrine of informed consent during her opening statement and closing arguments. The case was retried, leading to a verdict on the plaintiff's claims in favor of Dr. Ungarino, but against Phoebe Putney. The trial court denied Phoebe Putney's second motion for new trial.

5

In Case No. A13A1833, plaintiff appeals from the trial court's grant of the defendants' motions for new trial.

1. *The Law of Informed Consent.* Georgia law does not recognize a common law duty to inform patients of the risks of medical procedures. *Blotner v. Doreika*, 285 Ga. 481, 481-482 (1) (678 SE2d 80) (2009). By statute, however, any person who undergoes any surgical procedure under general anaesthesia, spinal anesthesia, major regional anesthesia, or any person who undergoes certain diagnostic procedures, must consent to the procedure. OCGA § 31-9-6.1 (a). This consent must be informed, meaning that the medical professional must fully inform the patient of the material "risks and alternatives to the proposed treatment so that the patient's right to decide is not diminished by a lack of relevant information."[1] (Footnote omitted.) *Pope v.*

---

[1] OCGA § 31-9-6.1 "sets forth six specified categories of information that must be disclosed by medical providers to their patients they undergo certain specified surgical or diagnostic procedures." (Footnote omitted.) *Albany Urology Clinic, P. C. v. Cleveland*, 272 Ga. 296, 298 (1) (528 SE2d 777) (2000). Those categories defined in OCGA § 31-9-6 are: (1) the patient's diagnosis necessitating the procedure; (2) the nature and purpose of the procedure; (3) the generally recognized and accepted *material risks* of infection, allergic reaction, disfigurement, brain or heart damage, etc., associated with the procedure; (4) the likelihood of the procedure's success; (5) the practical, accepted and recognized alternatives to the procedure; and (6) the

*Davis*, 261 Ga. App. 308, 309 (1) (582 SE2d 460) (2003). However, in cases where a medical provider was not obligated to obtain informed consent under OCGA § 31-9-6.1, "evidence of a failure to reveal the risks associated with medical treatment is not . . . admissible in support of a claim for professional negligence." *Blotner*, supra at 482 (1). In the present case, it is undisputed that the alleged negligent act in the present case, the administration of morphine, does not fall under OCGA § 31-9-6.1 (a).

2. In her first enumeration of error, plaintiff contends that the trial court erred in granting the defendants' motions for new trial because the defendants waived any objection to the admission of testimony or argument regarding the doctrine of informed consent because they failed to raise an objection to it at trial.

During the trial, the plaintiff presented Dr. Thomas Hyers as an expert in the field of pulmonary medicine. It is undisputed that the defendants did not object to Dr. Hyers' testimony during trial on the grounds that it improperly raised an informed consent claim. However, the defendants contend that they preserved their objection

_____

patient's prognosis if the procedure is rejected. OCGA § 31-9-6.1 (a) (1) - (6) (emphasis supplied).

7

by filing and obtaining a ruling on their Motion in Limine No. 18. See *Reno v. Reno*, 249 Ga. 855, 855 (295 SE2d 94) (1982) ("where a motion in limine to exclude certain evidence is [granted or] denied, the movant need not renew his objection when the disputed evidence is offered at trial[ ] in order to preserve the movant's right to appeal" from the ruling) (citation omitted).

Defendants' Motion in Limine No. 18, as written, clearly sought to preserve the defendants' objection to the introduction of any testimony indicating that the defendants violated the standard of care by failing to obtain the informed consent of the decedent or her family prior to the administration of the morphine. Motion in Limine No. 18 is captioned as follows: "This [c]ourt should prohibit plaintiff's counsel from eliciting testimony of criticism that does not rise to the level of a violation of the standard of care, including testimony regarding a failure to obtain informed consent from the family." The written motion in limine cites to pertinent Georgia case law regarding informed consent, and it seeks a ruling that neither the plaintiff nor plaintiff's witnesses, including Dr. Hyers, should be allowed to testify that Dr. Ungarino "had an obligation as a physician to explain to the family why he was giving such a dose of morphine[,]" or to testify that "Dr. Ungarino or the nurses

8

violated the standard of care by not informing the family (or the decedent) before the administration of morphine."

Plaintiff's argument that the defendants failed to preserve the objection to testimony regarding informed consent by not specifically arguing the issue during the motion in limine hearing is without merit. Plaintiff contends that when defendants argued their motion before the trial court, that they "presented the motion solely as a motion regarding causation[,]" arguing that any testimony regarding "Dr. Ungarino's failure to inform the patient of his course of treatment was not admissible because it was not *causally related* to Ms. Vinson's death." Pretermitting whether the defendants fully fleshed out their objection to testimony regarding the defendants' failure to obtain the informed consent of the decedent or her family prior to ordering and administering the morphine, the trial court's written order is clear that it considered the informed consent portion of their written motion and argument in denying the order. That written order states that "[d]efendants' Motion in Limine to prohibit [p]laintiff's counsel from eliciting testimony of criticism that does not rise to the level of a violation of the standard of care, *including a failure to obtain informed consent from the family*" was denied. (Emphasis supplied).

Plaintiff cites to cases holding that although a party's written motion raised a particular argument, that party's failure to raise the pertinent issue during the hearing on the motion waived subsequent objections to that issue. See *Barber v. State*, 236 Ga. App. 294, 297 (2), n. 1 (512 SE2d 48) (1999) (although defendant's written motion to suppress "could be read to encompass both the pre-trial and in-court identifications[,]" the fact that defense counsel during the hearing on the motion limited the relief sought to only pre-trial identification waived any objection to subsequent in-court identifications); *Roberson v. State*, 228 Ga. App. 416, 420 (3) (491 SE2d 864) (1997) (although defendant's written motion in limine asserted several grounds for the exclusion of an Intoxilyzer breath test, defendant waived his right to assert that the Intoxilyzer test failed to meet certain statutory standards by failing to argue that particular issue during the motion in limine hearing because and thus the trial court issued no definitive ruling on the issue). However, the present case is unlike *Roberson* because any failure by the defendants to fully flesh out their objection to any testimony regarding informed consent during oral argument did not lull "the trial court into issuing no ruling on this issue." (Citation and punctuation omitted.) Id. In the present case, it is clear from the trial court's written order that it

10

considered both the defendants' written motion in limine and oral argument when ruling, and that it specifically ruled upon the issue of informed consent.

We note, however, that the defendants' Motion in Limine No. 18 only sought to exclude testimony regarding informed consent by "[p]laintiff, [p]laintiff's witnesses or any standard of care experts." The motion does not seek to prohibit any mention of informed consent during the plaintiff's opening statement or closing argument. The defendants made no contemporaneous objection to any statement made by plaintiff's counsel during the opening statement or during closing argument that they believed to involve the informed consent doctrine. See *RNW Family Partnership, Ltd. v. Dept. of Transp.*, 307 Ga. App. 108-112 (6) (704 SE2d 211) (2010) (failure to object to statements made during opening statement during trial waive such objections on appeal). We further note that the trial court instructed the jury that "the opening statements and closing arguments of the lawyers" did not constitute evidence. Accordingly, we limit our holding to a finding that the defendants properly objected to the admission of any testimony regarding informed consent from plaintiff, plaintiff's witnesses, or any standard of care experts.

11

3. Plaintiff next contends that the trial court erred in granting Dr. Ungarino's motion for new trial, arguing that "[t]his case did not involve issues of informed consent at any point or through any testimony." We disagree.

In its order granting the defendants' motion for new trial, the trial court held that "by the time the plaintiff presented the case to the jury, the presentation focus shifted to arguments about the professionals' failure to inform Mrs. Vinson's family of Dr. Ungarino's order to give the morphine and the fact that they did not have the opportunity to reject that course of treatment." The trial court further noted that the informed consent issue was presented to the jury during the testimony of expert witnesses and that it "was the centerpiece of the plaintiff's case and presentation to the jury."

As noted in Division 2, the defendants waived their objection to any argument made by plaintiff's counsel during opening statement or closing argument. See *RNW Family Partnership, Ltd.*, supra. However, the trial court correctly concluded that the testimony of plaintiff's expert pulmonolgist, Dr. Hyers, did impermissibly reference the doctrine of informed consent.

Georgia common law imposes no duty upon a medical provider to obtain informed consent from a patient before administering a medical procedure not

12

specified in OCGA § 31-9-6.1, and the admission of any evidence that a physician failed to "reveal the risks associated with medical treatment is not . . . admissible in support of a claim for professional negligence." *Blotner*, supra, quoting *Albany Urology Clinic*, supra at 298. Informed consent "essentially involves a medical professional fully informing a patient of the risks of and alternatives to the proposed treatment so that the patient's right to decide is not diminished by a lack of relevant information." (Punctuation and footnote omitted.) *Paden v. Rudd*, 294 Ga. App. 603, 605 (2) (669 SE2d 548) (2008). See *Hyles v. Cockrill*, 169 Ga. App. 132, 133 (2) (312 SE2d 124) (1983) overruled on other grounds, *Ketchup v. Howard*, 247 Ga. App. 54, 60 (2) (543 SE2d 371) (2000) (trial court did not err in excluding testimony regarding informed consent in a medical-malpractice action).

Plaintiff suggests that the trial court's ruling is in error because any testimony elicited from plaintiff's expert pulmonologist, Dr. Hyers, regarding his belief that Dr. Ungarino had a duty to communicate his plan to administer 20 milligrams of morphine was in reference to a physician's obligation to obtain his patient's "basic consent" by "inform[ing] . . . his patients of his general course of treatment," and was not in regards to a physician's obligation under any law to obtain informed consent

regarding the risks and alternatives before a medical treatment.[2] However, the testimony of Dr. Hyers belies this argument.

On direct and re-direct examination, plaintiff's counsel elicited testimony from Dr. Hyers indicating that he believed Dr. Ungarino violated the standard of care by failing to communicate his plans to increase the decedent's dose of morphine to her primary care doctors, to the decedent herself, or to the family members who were present. He testified that the 20 milligrams of morphine given by Dr. Ungarino was likely intended to be a "comfort measure" (although he believed the dose ordered by Dr. Ungarino was higher than necessary for an effective comfort measure), which is given to bring comfort and relief to the patient "even if it could have the effect of hastening the death of the patient." He explained that, prior to providing morphine as a "comfort measure," a physician such as Dr. Ungarino,

---

[2] In *Ketchup*, supra at 55-56 (1), this Court explained that 'consent' in the medical sense involves two distinct legal principles, both derived from common law doctrine. The first principle involves 'basic' consent, meaning that consent which avoids a battery, i.e., the consent to 'touching'. . . . The second principle of consent in the medical context is 'informed' consent, which addresses the autonomy of a competent patient to determine what medical treatment he will allow or refuse.

certainly know[s] that there's a possibility that someone could die a little sooner and [the physician should] explain that to the family . . . what [the physician is] doing ethically as a physician is trying to make the patient comfortable not trying to make the patient die sooner. If the sooner death occurs a few minutes earlier you want to be sure the family understands that. . . .

Dr. Hyers further explained that a physician is obligated to inform the patient and the patient's family before providing such comfort care so that the family can decide whether to prioritize keeping the patient comfortable or keeping the patient alive longer. Plaintiff's counsel then asked: "[W]hat is the reason why . . . you have to inform them? Do they have the right to choose not to take [comfort measures]"?, Dr. Hyers responded, "Yes."

It is clear to this Court that this testimony and Plaintiff's counsel's question involved a physician's duty, prior to administering 'comfort care' measures, to apprise a patient or her family of the following information required under Georgia's Informed Consent statute, OCGA § 31-9-6.1: the reason why a physician ordered such 'comfort care' measures; the material risks and alternatives to the proposed medical treatment – i.e., potentially hastening death; and alternatives to treatment, such as not administering the 'comfort care' medication. Thus, we find that Dr.

Hyer's testimony "was an attempt to put before the jury the issue of the 'informed consent' doctrine." *Hyles*, supra.

This Court's analysis of an expert physician's testimony in *Hyles*, supra is particularly instructive in this case. In *Hyles*, this Court held that the trial court correctly sustained an objection to a expert physician witness's testimony that the "recognized standard medical and surgical care would require you to inform a patient about the possible complications before you do it so that they may have a chance to make a choice whether they want to undergo the procedure" on the grounds that it was an attempt to impermissibly put the issue of informed consent before the jury. Id. at 133 (2). The *Hyels* court reasoned that under Georgia common law, "[w]hile the attending physician is required to inform his patient of the general terms of treatment, this duty does not require a disclosure of the risks of treatment." (Citation and punctuation omitted.) Id. In the present case, Dr. Hyers' testimony clearly states that when a physician decides to administer a higher dose of morphine as a 'comfort measure,' he is obligated to inform the patient or her family of the *material risk* of such treatment – i.e., that the drug may hasten the patient's death. See *Pope*, supra. ("Informed consent essentially involves a medical professional fully informing a

patient of the risks of and alternatives to the proposed treatment so that the patient's right to decide is not diminished by a lack of information") (footnote omitted).

Accordingly, we affirm the trial court's grant of the motion for new trial as it pertains to Dr. Ungarino. As to Phoebe Putney, see division 4(b) herein below.

*Case Nos. A14A0044 and A14A0045*

After the trial court's grant of the defendants' motions for new trial, the case was re-tried and the jury found in favor of Dr. Ungarino, but returned a verdict in favor of plaintiff and against Phoebe Putney. Phoebe Putney filed a second motion for new trial, which was denied. In Case No. A14A0044, Phoebe Putney appealed the judgment against it after the second trial, and plaintiff filed a cross-appeal in A14A0045.

4. In Case No. A14A0045, plaintiff argues that the trial court's grant of defendant Phoebe Putney's first motion for new trial on the grounds that the doctrine of informed consent was improperly injected into the trial was in error because Phoebe Putney failed to preserve this objection and because there was no testimony presented at trial that Nurse Hurdle should have obtained the informed consent from the decedent or her family prior to administering the morphine ordered by Dr. Ungarino.

17

(a) Phoebe Putney's first enumeration again addresses the defendants' failure to object to any admission of evidence regarding the doctrine of informed consent into trial. This enumeration is substantially the same as that raised by both defendants in Case No. A13A1833 and addressed in Division 2. Accordingly, we adopt our holding in Division 2 of this opinion which provides that the defendants did not waive any objection to testimony regarding the doctrine of informed consent by plaintiff's witnesses.

(b) Plaintiff argues that the trial court should not have granted Phoebe Putney's first motion for new trial because there was no testimony by plaintiff or any of plaintiff's witnesses, including its expert on nursing, Nurse Sharon Quinn, that the nurse who administered the morphine to the decedent per Dr. Ungarino's orders should have obtained the family's informed consent prior to doing so.

Plaintiff's complaint alleged that Phoebe Putney was vicariously liable for the actions of its nurse, Linda Hurdle, for administering the morphine ordered by Dr. Ungarino. At trial, plaintiff presented Nurse Sharon Quinn as an expert in nursing. Nurse Quinn testified that it was her opinion that Nurse Hurdle violated the standard of care by not questioning the 20 milligram dose of morphine ordered by Dr. Ungarino before administering it because the order was drastically higher than the

18

dose originally ordered by the decedent's attending physician. Nurse Quinn further testified that nurse Hurdle should have told the patient what medication she was administering before it was given because the standard of care requires a nurse to tell a patient what medication she's giving and in what dosage before she administers it.[3] Nurse Quinn explained that this requirement is a safety mechanism that allows the nurse to ensure that the patient is getting the right medication, that the patient does not have an allergy, and to give the patient the ability to exercise his or her right to refuse the medication. Nurse Quinn explained that she would also generally tell a patient what side effects the patient might experience with a particular type of medication, i. e., that it would make the patient sleepy or nauseous.

Although Nurse Quinn testified that a nurse should inform a patient what medication and dosage she was administering and what *side effects* such medication might have upon that patient, at no time during Nurse Quinn's testimony did she explain that nurse Hurdle should have explained the *material risks or alternatives* to

---

[3] We question the relevance of this testimony given that the plaintiff's theory was that Nurse Quinn should have questioned the drastic change in the amount of the morphine dosage, but that the issue of relevance was neither raised as an objection at trial nor as an issue in this appeal.

any proposed treatment.[4] Such testimony did not constitute an implication that Nurse Hurdle violated Georgia's Informed Consent Doctrine. See *Paden*, supra; *Ketchup*, supra. Because plaintiff's cause of action against Phoebe Putney sought damages only for the hospital's vicarious liability for the actions of it's nurse, Nurse Hurdle, and because there was no impermissible testimony injected in the trial that Nurse Hurdle should have obtained the patient's or her family's informed consent before administering the morphine dosage ordered by Dr. Ungarino, we reverse the trial court's grant of the defendant's motion for new trial as it applies to Phoebe Putney.[5]

---

[4] Georgia's Informed Consent statute does not mandate that a patient be informed of *all* risks of certain specific procedures, but rather it states that in order for a patient to provide informed consent, that patient must be informed of *"material risks* generally recognized and accepted by reasonably prudent physicians of infection, allergic reaction, severe loss of blood, loss or loss of function of any limb or organ, paralysis . . . or death involved in such proposed surgical or diagnostic procedure. . . ." OCGA § 31-9-6.1 (a) (3) (Emphasis supplied).

[5] In its appellate brief, Phoebe Putney does not argue that Nurse Hurdle injected impermissible testimony regarding the doctrine of informed consent into trial. Rather, Phoebe Putney argues that "the testimony submitted by Dr. Hyers was prejudicial to all [d]efendants, including [Phoebe Putney]." We are unpersuaded. Further, Phoebe Putney's arguments that statements made by plaintiff's counsel during opening statement and closing argument have been waived by Phoebe Putney's failure contemporaneously to object to such. See Division 2 of this opinion, supra.

20

5. In Case No. A14A0044, Phoebe Putney appeals from the trial court's denial of its second motion for new trial, filed after the jury issued a verdict against it after the second trial. Phoebe Putney raises several enumerations of error allegedly committed by the trial court during the second trial. However, as a result of Division 4 of this opinion, which finds that the trial court erred in granting Phoebe Putney's motion for new trial after the original trial, we dismiss this appeal as moot.

Based upon the above, we affirm in part and reverse in part the judgment in Case No. A13A1833, reverse the judgment in Case No. A14A0045 and dismiss Case No. A14A0044 as moot.

*Judgment affirmed in part and reversed in part in Case No. A13A1833, reversed in Case No. A14A0045, and Case No. A14A0044 is dismissed as moot. Barnes, P. J., concurs, and Miller, J., concurs in judgment only.*